HENRY M. BRYAN, Appellant, *v.* BUEL T. HITCHCOCK, Respondent.

1. *Equity — Action to set aside conveyance of land on ground of fraud, what circumstances warrant.*— In an action to annul the conveyance of certain lots of land, given in exchange for certain shares of stock, on the ground that the conveyances were obtained through false and fraudulent representations and suppressions touching the financial standing, condition, and prospects of the company, and the value of its stock: *held,* that a court will not rescind such a contract without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was founded upon them.

*Appeal from 'St. Louis Circuit Court.*

*Napton*, for appellant.

I. A statement of a fact or facts made by a vendor to a vendee, calculated to have, or capable of exerting, an influence on his determination to buy or refuse, which fact or facts turn out to be false, or not facts, constitutes a sufficient ground with a court of equity for setting aside the sale or contract, especially if the statement is knowingly false and intended to mislead. (Daggett v. Emerson, 3 Sto. 733 ; N. B. & C. R.R. v. Muggeredge, 1 Dru. & Sm. 365; Reynall v. Sprye, 1 De Gex. M. & G. 708 ; Rawlins v. Wickham, 28 Law Jour., N. S., p. 188 ; Harris v. Kemble, 2 Dow & Cl. 463–71 ; Henderson v. R.R. Co., 17 Texas, 579; Smith v. Countryman, 30 N. Y. 655 ; Mead v. Brown, 32 N. Y. 275 ; 2 Sto. Eq. § 799.)

II. Representations of opinions, if they form part of a scheme to mislead, or if the person making them has peculiar means of forming a correct opinion not open to the other party, are also grounds for setting aside a contract, if the opinions expressed were really not entertained or were perfectly groundless. (Sto. Eq. Jur. § 179 ; Henderson v. R.R. Co., 17 Texas, 579.)

III. A statement of intention made by a vendor as to his future course may be also false and fraudulent, and, as such, constitute sufficient grounds to authorize a court of equity to vacate a contract based on or induced by such false representations. (2 Duer Ins. 707 ; Henderson v. R.R. Co., 17 Texas, 579.)

IV. Misrepresentations of the vendor's motives in selling may materially influence the vendee's decision and thus constitute a cunning artifice to mislead ; but

V. Where all these different classes of misrepresentations are combined, and as a whole are well calculated to mislead, however small might be the effect of each one singly, and where they all come from a party whose position not only enables him to know their truth or untruth, but raises the presumption in law that he does so know and is so informed, the case for the action of a

court of equity is much stronger than it would be upon proof of a single false statement of facts.

*Sharp & Broadhead*, and *Jones & Davis*, for respondent.

Where a contract for exchange of property is asked to be set aside on the ground of misrepresentations, there must always be the clearest proof of the fraudulent representations, and that they were made under circumstances which show that the contract was founded upon them. (Holland v. Anderson, 38 Mo. 55; 3 Greenl. 30; 4 Mass. 502; 15 Verm. 271; 3 Wend. 236; 6 Hill, 340; 3 Johns. Ch. 23.)

CURRIER, Judge, delivered the opinion of the court.

Early in the year 1866 various citizens of St. Louis associated themselves together in corporate form, under the name of the "St. Louis Museum, Opera, and Fine-Art Gallery Company," for the purpose of erecting and operating a Museum and Theater on the plan of similar institutions in Chicago, Boston, and New York. The company was organized and a board of directors and other officers appointed. Stock was subscribed to a considerable amount — one of the witnesses, Lamb, the president of the company, placing it as high as $105,000.

The Museum building was erected in the course of the season, and so far completed and equipped that it was opened for the business contemplated in the month of October, and for a period the institution enjoyed an encouraging and very satisfactory measure of patronage. It promised success. In the meanwhile the collections of calls upon the stock failed to keep pace with the company's expenditures, considerable sums being advanced by the directors to meet maturing bills. Only about $60,000 appears to have been realized from the whole stock subscribed. The original estimates contemplated an expenditure of less than $100,000, while the actual cost of the building and its various furnishings reached the sum of $125,000 or more. Thus, while the company's cash resources from stock subscription shrank on the one hand, its investments increased on the other, producing

the result of a heavy balance of indebtedness, amounting to some $70,000.

This, substantially, was the condition of the company in December, 1866, when the plaintiff and defendant met and entered into the transactions which form the subject of this suit. They made two contracts : by the first, the plaintiff, on the 19th of December, conveyed to the defendant three vacant lots of ground in North St. Louis, in exchange for fifty-three shares of the Museum stock ; by the second, on the 22d of that month, he made a further conveyance of two other lots in the same general location for ten additional shares of the stock and forty acres of wild land. By this suit the plaintiff seeks to secure a judicial re-exchange of the property, and for that purpose asks the court, by its decree, to rescind the contracts of sale and annul his conveyances to the defendant. This is asked on the ground that the contracts and conveyances were obtained by the defendant through false and fraudulent representations and suppressions on his part in regard to the financial standing, condition, and prospects of the Museum company and the value of its stock.

The answer traverses every material allegation of the petition, and the case turns wholly upon the sufficiency of the proofs to establish the facts alleged in disparagement of the honesty and fairness on the part of the defendant of the transactions in question. The representations complained of as untrue, and as having mislead the plaintiff, relate to the defendant's statements respecting his (the defendant's) motives, intentions, and opinions, as well as his statements of fact touching the financial condition and business prospects of the Museum. These latter, however, are the main and controlling subjects of inquiry. They embrace the amount of Museum stock subscribed ; the payments therefor, whether at par or otherwise ; the amount actually paid in thereon ; the actual total cost of the Museum property ; the indebtedness of the company in December, 1866 ; the mode proposed for meeting that indebtedness, and the market value of the Museum stock at that time, or rather, more specifically, the price paid for it by Mr. Franciscus, and the defendant's representations in relation thereto.

It is not proposed to sift, analyze, and collate the voluminous testimony bearing on these points. It were perhaps sufficient to say that, after a careful examination of it throughout, it fails to satisfy our minds that there is any such preponderance of proof in support of the plaintiff's allegations as to justify us in overturning the judgment of the court below.

These parties met, and, after some days of negotiations, which furnished adequate opportunities of inquiry and investigation, concluded the bargain which resulted in the exchanges of property already mentioned. The transaction was not one where fraud is to be presumed, nor will it be inferred from circumstances which point to no certain and definite results, although of a suspicious character. Where mere circumstances are relied on, they must be such as to raise strong presumptions of the actual existence of the fraud imputed. This is considered to belong to that class of cases where, as Judge Story says, the court will not rescind the contract of the parties "without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was founded upon them." (1 Sto. Eq. Jur. § 199 ; 38 Mo. 55.) Nor will courts of equity aid parties who neglect the use of their own judgment and discretion in their business transactions. It is not sufficient that Hitchcock's representations should have been inaccurate and misleading, or even willfully false. The plaintiff must have rested the transaction upon the faith of them. Now, these parties were strangers until these negotiations were initiated, and they were concluded in the course of a few days. It is a little remarkable that Mr. Ryan should have consummated the arrangement with the defendant, and conveyed away his property, relying upon nothing but the interested statements and representations of one respecting whom he knew so little, and especially when other means of information were so open and accessible to him. There is an antecedent improbability that he would act so inconsiderately.

It further appears that Mr. Bryan's attention had been drawn to the Museum previously, and by other parties ; that he had heard its play representations and audiences spoken of favorably—which

was suggestive of success; and that, pending the negotiations, he made inquiry as to the character of the Museum property and the value of its stock, of Mr. Rowland; and that Shryock & Rowland, two stockholders and well-known business men of the city, gave him a favorable account of both, Rowland pointing to the Museum building as an index of value, and Shryock saying that he saw no reason why the stock should not be good. Was Mr. Bryan's mind brought to a decision, in the exchange of his non-productive vacant lots for stock which seemed to promise dividends, by the evidence of value in the visible Museum property pointed to by Rowland, by the favorable reports of theatrical performances and the good audiences, and by the strong expressions of confidence on the part of Shryock & Rowland, or by the interested statements and representations of a mere stranger? As to Hitchcock's representations, what were they? It appears by the replication and the plaintiff's testimony, among other things, that he stated the condition of the Museum thus: Total expenditures in building and equipments, about $125,000; stock subscriptions, about $85,000; floating debt, $45,000. What is meant by "floating debt" is not explained. It may refer to an indebtedness "floating" through the banks on the directors' paper. Hitchcock swears, and in this is not contradicted, that he told Bryan there was an indebtedness of $45,000 in notes which had been discounted by the directors. It is probable that the $45,000 was referred to in both forms of expression as being in notes, and at the same time as a floating debt. However this may be, it is manifest upon the face of the statement that the sums were given, and understood to be given, as round estimates approximating correctness, but subject to variations. Bryan testifies that the sums $125,000 and $85,000 were given as "about" the respective amounts of cost of construction, etc., and stock subscribed. He denies, however, that Hitchcock said the stock was not fully paid up, and says that his impression was that the stock was paid in full. He does not say that Hitchcock says so, but only that he got the impression that such was the fact. On the other hand, Hitchcock swears positively that he informed the plaintiff that $60,000 or thereabouts had been paid, and that there were uncollected balances against

the subscribers. The indebtedness of the company was of course the amount invested, $125,000, less the aggregate sum realized from stock. There is obscurity in regard to the stock subscriptions. Lamb, the president, puts it at $105,000, and its available value at $75,000—$65,000 having been paid in, as he states it. Collins, a witness for the plaintiff, and a director, puts the available value at $85,000 ; and the defendant would seem to have regarded it as not exceeding $80,000, which is the difference between the total investment and the amount to be raised on fresh subscriptions of stock, as he proposed should be done. The result does not indicate that more than $60,000 or thereabouts was ever collected. But the availability of the balance was a matter about which different men having knowledge of the subject have different opinions. It was a topic, according to the plaintiff's testimony, that did not come up for consideration between him and the defendant; but the defendant swears that he informed the plaintiff of the amount actually paid in — to-wit, $60,000— thus showing a deficiency of $25,000 on the subscription of $85,000. This is met by Mr. Bryan's "impression" that the stock was fully paid, and his statement of what he says Hitchcock did not say — namely, that the stock was not fully paid. There may have been here a fraudulent suppression of a fact which ought to have been distinctly placed before Mr. Bryan's mind, but the testimony is not sufficient to justify a judgment rescinding the contract between the parties on that ground. That there was about $85,000 of stock subscriptions, as the defendant represented, the evidence shows. Why no more was collected does not satisfactorily appear. It is not shown that the subscribers were discharged from their obligations to pay, or that they were insolvent.

That the plaintiff based his transactions with the defendant upon the assumption that $125,000 had been invested in the Museum property, and that all of this sum had been paid off except $45,000, does not very satisfactorily appear. He seems rather to have reduced the value of the stock from the visible property which it represented, the apparent success of the general enterprise, and the character of the body of stockholders and of the

man who had the enterprise in charge, and the favoring opinions of men who were supposed to be competent judges. It is not usual for stock to be purchased without an overhauling of the internal affairs of the corporation issuing it. This stock, it is true, had no established market value. It was, however, bought and sold at half its nominal value, and also at higher rates—and this by business men of sagacity. The belief that Mr. Franciscus had paid seventy cents on a dollar for it was all calculated to influence the plaintiff's action. It, at the same time, shows that he was aware that the stock was being sold at a heavy discount from par. It is not easy, therefore, to reach the conclusion that the plaintiff looked upon the transaction as resting on a cash basis, that he could have regarded the sixty-three shares of stock which he acquired as the equivalent of $6,300 in cash. But Mr. Franciscus did not pay seventy cents on a dollar for the stock purchased by him, but only fifty. The plaintiff swears that Hitchcock told him that Franciscus paid seventy cents. This Hitchcock positively denies, but states that he did tell the plaintiff that he had understood that some of the subscribers who had worked on the Museum, and had taken stock in payment, had offered to sell at seventy cents. The witness Brogan, who was present at one inverview between the parties, stated that Hitchcock said that some mechanic had sold for seventy cents, but that he (the witness) did not recollect the name of the purchaser. Franciscus and Brentano both testify that they had heard of sales at seventy cents, Franciscus speaking of one at sixty cents. The probability is that there was some confusion or misunderstanding in the plaintiff's mind in regard to the precise shape of Mr. Hitchcock's statement on this subject. For it is highly improbable that a man of the tact and shrewdness ascribed to Hitchcock would have perpetrated a falsehood of so grave a character, which was open to such swift and sure exposure. Mr. Franciscus was too well known and too near at hand to render such an operation at all prudent. The supposed falsehood involved great recklessness as well as moral turpitude. As regards the business of the Museum from its opening, forward to the date of these transactions, a period of some sixty days

only, the testimony fails to fix on the defendant any false statements respecting it. All the witnesses who were examined on this point concur in representing the patronage of the Museum as good — at first as highly encouraging, and of an extent and character to promise success to the enterprise; that the dramatic peformances were creditable and the audiences fully up to expectations. As the season advanced there was a diminution of attendance, and consequently of receipts. But this does not appear to have been peculiar to this particular play-house. It did as well, if not better, than others, the witnesses say. Lamb testifies that there was a profit on the business for the first twenty days of December, although less than it had previously been. The plaintiff's subsequent acts indicate a continued confidence in the business prospects of the establishment. Otherwise it is difficult to understand the motives that induced his conditional subscription of $5,000 more of the stock after he had become a director and was made acquainted with the situation of affairs. Hitchcock, too, appears to have been ready to take more stock, provided the other parties in interest would do so. All this indicates confidence in the business prospects of the company, its indebtedness being cleared off.

It is not deemed needful to pursue the subject further. This review embraces what is regarded as the most material parts of the testimony and the controlling points of the case. As already stated, we are not able to take such a view of the testimony as would justify a reversal of the judgment of the Circuit Court, and it is accordingly affirmed. The other judges concur.