———o———

THOMAS WANNELL, Appellant, *vs.* SAMUEL KEM, *et al.*, Respondents.

1. *Practice, civil—Evidence—Juries.*—In civil cases at law juries are the sole judges of the preponderance of testimony.

2. *Married woman—Conveyance of —Notary's certificate—Statutory requirements touching explanation and examination, etc., imperative.*—In suit upon a mortgage given by a married woman upon her real estate, the certificate to her acknowledgment is not conclusive; and where she testifies that she was not by the notary made acquainted with the contents of the deed, nor examined apart from her husband, nor asked if she executed it voluntarily, it is improper to show her knowledge of the deed prior and subsequent to her examination, and, that, in point of fact, she was not influenced by compulsion or improper means by her husband. The statutory requirements touching such examination and information by the notary are imperative, and must be complied with as a necessary pre-requisite to a valid conveyance of her property.

3. *Vendors—Misrepresentations of as to property sold—Negligence of vendee in making inquiries, may be set up by vendor, when—Estoppel.*—In suit upon a promissory note given for the purchase of certain stock, it appeared that defendant purchased the same from the president of the company, who represented

that the stock was at par, that the business was of great value, and that the corporation was solvent, all which representations proved untrue. It further appeared that defendant, before his purchase, had ample opportunities to learn the true state of affairs. But, *held*, that defendant had a right to presume that the vendory as president of the company, was fully informed as to its financial condition, and the failure of the vendee to make inquiries relating thereto in other quarters was no proof of negligence such as would estop him from pleading the false representations as a bar to recovery on the note.

4. *Vendor—Fraudulent misrepresentations—What sufficient to defeat claim for purchase money.*—Fraudulent misrepresentations in order to defeat a recovery of purchase money for the property sold, must be made with intent to deceive and must be solely and exclusively relied upon by the vendee in making his purchase.

5. *Fraudulent misrepresentations—Negligence of vendee—Plea of—Parties must be on equal footing.*—Generally, where the courts have refused to uphold the defense of fraudulent misrepresentations of the vendor, basing the refusal on negligence of the vendee in ascertaining the facts, the case referred to sales of land, and both parties had equal opportunities of information. When vendor and vendee do not occupy an equal footing in this respect, the plea of negligence will not avail.

### *Appeal from Louisiana Court of Common Pleas.*

### *Henry D. Laughlin,* for Appellant.

I. The instructions put the case to the jury on the theory that Kem had the right to rely solely upon Brolaski's representations, whether other means of information were at his disposal or not; and that it was only necessary for the jury to believe that he did so rely, to entitle him to a verdict. This is not the law. (Langdon vs. Green, 49 Mo., 363; Holland vs. Anderson, 38 Mo., 56; Bryan vs. Hitchcock, 43 Mo., 527; McFarland vs. Carver, 34 Mo., 195; Fish vs. Cleland, 33 Ill., 238; Miller vs. Young's adm'r, 33 Ill., 355; Mitchell vs. Deeds, 49 Ill., 416; Miller vs. Craig, 46 Ill., 109; Eames vs. Morgan, 37 Ill., 260; Belden vs. Henriguez, 8 Cal., 89; Barton vs. Simmons; 14 Ind., 49; Wagn. Stat., 1021, § 49.)

*Fagg & Dyer,* for Respondents.

NAPTON, Judge, delivered the opinion of the court.

This was an action on a note for $8,000, given in consideration of 160 shares of stock in the "Mo. Gas Works Building

Co.," signed by defendant Kem and his wife, and secured by a deed of trust on Mrs. Kem's land in Pike county.

The defense was, that Brolaski, the vendor of the stock, to whom the note and mortgage were given, had made false and fraudulent representations in regard to its value, and the condition of the company; that the purchaser relied solely on these representations, and that the stock was really of no value, and therefore, the note was without consideration.

On the part of Mrs. Kem the additional plea was made, that the acknowledgment of the deed on her part was not made according to law; that there was no privy examination of her, separate and apart, from her husband, and that the contents of the deed were not explained to her by the notary.

These issues were tried by a jury, and a verdict rendered on each for the defendants. The propriety of the judgment based on this verdict is denied in this court on two grounds only; one, that the court excluded testimony offered which ought to have been admitted, and admitted testimony which ought to have been excluded; the other, that the instructions of the court to the jury were erroneous.

So far as Mrs. Kem is concerned, her testimony was clear, that her husband was present during her examination by the notary, and that the notary gave no explanation or information to her of the contents of the deed she signed. The notary, however, testified precisely to the contrary, that she was examined separate and apart from her husband, and that he explained to her the purport of the deed. There is no possibility of reconciling these conflicting statements, and it was a simple question of credibility with the jury, and the verdict of the jury cannot be disturbed here on this point.

But there were various questions propounded to Mrs. Kem on her cross-examination, which were excluded by the court, and the exclusion of these questions is properly a matter for our consideration. These questions were as follows: 1. Did you know at the time you signed this deed (showing the mortgage deed to witness) what it contained? 2. Had you ever seen the mortgage before the notary came to your house

to take the acknowledgment? 3. Had .you ever read the mortgage before the notary came to your house? 4. Did you know for what purpose you executed the paper, before your acknowledgment was taken? 5. Did you know for what purpose the notary came? 6. I will now ask you if the paper (the mortgage) was your voluntary act and deed for the uses and purposes mentioned in it, and did you not execute it for those uses and purposes freely, without fear, without compulsion, and without any undue influence on the part of your husband? 7. Did you not see the mortgage, after the acknowledgment was taken, in the possession of your husband, and did you not know that he intended to take it to St. Louis and did take it there to deliver to Brolaski to secure him on the payment of the note? 8. Did you not execute this deed voluntarily? These questions were all excluded by the court, and Mrs. Kem was not allowed to answer them or any of them. Exceptions were taken to this ruling.

Our statute laws point out and direct the mode, and the only mode, in which a married woman can convey her lands, and particularly specifies the duty of the court or officer before whom the acknowledgment is taken, and the character of the certificate to such acknowledgment. This certificate must substantially conform to the requirements of the statute, and the facts certified to must of course be true and not false. The certificate, if substantially in compliance with the law, is sufficient evidence of the wife's acknowledgment, but it is not conclusive, and may be shown on a proper issue to be false.

In this case the wife testified to the falsity of the certificate in two material particulars, one of which was, that there was no privy examination by the notary at all; and another was that she was not made acquainted by the notary with the contents of the deed; and she further declared that she was not asked if she executed the deed voluntarily and without compulsion or undue influence of her husband. The questions propounded to her, and which the court excluded, were designed to show her knowledge of the deed, previous to her examination, and subsequent to it, and that in point of fact,

31—VOL. LVII.

she was not at all influenced by any compulsion or improper means by her husband.

We think these questions were properly excluded. The legislature has required, for good reasons, a privy examination, and an explanation on such privy examination of the contents or purport of the deed. The courts have no power to say that those things in a particular case were unnecessary, on the ground that the facts in such case were, that there was no compulsion, and the wife was really entirely familiar with the deed, and executed it without the slightest improper influence from her husband.

The object of our statute is to prevent imposition on the wife in the disposition of her lands, and, therefore, it is not intended to leave it in the power of the husband to explain to his wife the object and purport of the deed, but to require a disinterested officer or court to make to her whatever explanation is necessary, and to ascertain her willingness to sign the deed. If a previous examination by the wife, of a deed which she is called upon to acknowledge, is all that is necessary, it would be in the power of an unscrupulous husband to procure her acknowledgment to a different deed from the one previously explained to her, in case the signature is made first in the presence of the notary, and in cases where she had signed before seeing the notary, it would be also in the power of the husband to misrepresent to her the object and effect of the deed.

To prevent any such imposition on the wife, it was therefore provided, that a specified officer or court should examine the wife, separate and apart from her husband, and on such examination should explain to her the object of the instrument proposed to be acknowledged, and should ascertain in this way, that the wife was not unduly influenced by her husband, and certify to those facts in his certificate of acknowledgment.

The history of this case shows how this question arose and, perhaps, even explains the finding of the jury under the instructions of the court. The original certificate of acknowl-

edgment, in this case, was simply one of the ordinary character of acknowledgment, where the party was not a married woman. Nothing whatever was stated in regard to a privy examination; nothing relative to an explanation of the deed; nothing in regard to the absence of undue influence. This was so obviously defective, so far as the wife's estate is concerned, that a bill was filed to get a decree or order from the Circuit Court in the exercise of its equitable power to procure a correction of the certificate. This court, however, on a review of this case, decided that the courts had no power over such mistakes, but intimated that the notary—the officer who took the acknowledgment—might correct the certificate, if, in point of fact, this privy examination, explanation, etc., had been made. (Wannell vs. Kem, 51 Mo., 150.) The subsequent certificate which the notary substituted for the original one which he erased, was accordingly, long after the acknowledgment, appended to the deed, conforming exactly to the requirements of the statute in regard to passing the estate of a married woman.

If we assume this last certificate as true, and stating the facts as they occurred, it is plain that the notary, at the date of his examination and certificate, was perfectly aware of what was required by the statute, and it is remarkably strange that his first certificate, given at the very time when all these transactions occurred, should have omitted all notice of them entirely.

Errors might have been committed in point of form, or even mistakes in point of law; but how the notary, after having made a privy examination, and learned the total absence of influence on the wife, or having given an explanation to her of the contents of the deed, should have totally omitted all mention, or attempt to mention, however imperfectly, any of these things which the notary knew were necessary, (or he would not have made them) is, to say the least, difficult to account for, and it is not surprising under these circumstances, that the jury found for the defendant, Mrs. Kem.

However this may be, the verdict in this case was for Mrs. Kem, and under proper instructions on this point, as will be seen upon an examination of them as hereinafter copied, and cannot therefore be disturbed; and this verdict and judgment in truth renders the deed of mortgage void as to the husband as well as the wife. (Wagn. Stat., p. 935, § 14 ; Wannell vs. Kem, 51 Mo., 152.) But as the plaintiff has a right to a reversal of the judgment, so far as the note is concerned, if the instructions were erroneous, it is still necessary to examine the propriety of the instructions.

The defendant, Kem, purchased the stock, for which this note was given, from Brolaski, who was the president of the " Mo. Gas Works Building Co.," and set up in his answer, that he was induced to buy the stock, entirely relying on the statements of said Brolaski, in regard to the condition of the company, the value of its assets, the amount of its liabilities, the value of the stock, the quality of the gas proposed to be made, and its cost, and that on all these points and others, he was fraudulently and knowingly deceived by the statements and representations of said Brolaski. This was denied in the replication, and the main, and indeed only point at issue, so far as Kem was concerned, was, whether such representations were in fact made, and whether they were of such a character as to avoid the sale.

The evidence in this case occupies over one hundred and fifty pages of closely written manuscript in the bill of exceptions, and even a condensed statement of it would throw no light upon the points of law raised by the instructions. It was a purchase of stock in this Gas Light Company and the vendor was president of the company. The vendor, it is alleged, represented to Kem that the stock was at par, that the company owned what is called the " Dean's Patent," for manufacturing gas from petroleum instead of coal ; that such gas was greatly superior in brilliancy and greatly cheaper in production than the ordinary gas made from coal ; that in fact, it could be made at half the price of gas made from the best Pittsburg coal ; and that the company was solvent. These

representations were attempted to be proved fraudulent and untrue, and made for purposes of deception. The stock proved to be valueless, yet the defendant, allured by these representations of Brolaski, made the purchase, was elected president of the company in place of Brolaski, and occupied that position for seven months.

There was evidence on the other hand to show that the defendant, Kem, repeatedly visited St. Louis, with a view to this purchase; that he had ample opportunities of acquainting himself with the probabilities of the success of this speculation; that he finally accepted a written proposal of Brolaski, was elected president of the company, at a salary of $2,000 per annum, and visited various parts of the State for the purpose of getting contracts to put up works on this "Dean's Patent" plan.

But as we are not empowered to examine the weight of this testimony, the only question here is as to the propriety of the instructions. Those given by the court were as follows:

1. The jury is instructed that the burden of proof in this case rests on the defendant, Samuel Kem, to show that said Brolaski, in making said sale and for the purpose of inducing him to purchase said stock, made the false and fraudulent representations set forth in defendant's answer, and before the jury can find a verdict for Kem, they must believe from the testimony, that there is a preponderance of proof in support of the substantial allegations contained in the answer of the defendant, Samuel Kem, and that, in purchasing said gas stock, Kem relied solely upon the representations made to him by Brolaski.

2. The jury is instructed, that mere circumstances which tend to no definite or certain results, are not of themselves sufficient to establish the fact that Brolaski acted fraudulently in the sale of the gas stock to Kem; but any false and fraudulent representations or statements made by the said Brolaski in the sale of said stock to Kem, must be shown by the proof in the case, in order to maintain the defense set up in defend-

ant's answer. And it must also appear to the satisfaction of the jury, that Kem, in making the purchase, relied solely upon the statements made by the said Brolaski; and that he was induced to buy this stock upon said representations or statements.

3. Although the jury may believe from the testimony in the case, that Brolaski, prior to the sale of the gas stock to Kem, falsely and fraudulently represented to him that said company at that time was solvent, that its stock was worth par, that the gas manufactured by what is known as the Dean's Patent, was superior in brilliancy to the gas manufactured from the best quality of Pittsburg coal, and that the same could be manufactured for less money than it required to manufacture gas from coal, they must find a verdict for the plaintiff, unless the jury further believe from the evidence in the case, that Kem in making said purchase relied solely and exclusively upon the statements made by Brolaski in reference thereto.

4. The jury is instructed, as a matter of law, that false representations made by a vendor, in the sale of a chattel, to amount to a fraud upon the purchaser, must be known to be false when made, and made with the intent to deceive the purchaser. The jury is therefore instructed, that although they may believe, from the testimony, that Brolaski did make the statements and representations set up in Samuel Kem's answer, and that the representations so made by him were false, and that Kem was induced to make the purchase on account of those false representations and statements, yet, before the jury can find a verdict for Kem, they must further believe, from the testimony, that Brolaski, at the time he made the representations, knew that they were false and were made by him with intent to deceive Kem in the purchase of said stock.

5. If the jury believe, from the testimony, that the defendant, Kem, made the investment for which the note was given, relying solely on the strength of his own judgment and his confidence in the then future prospects of the company, they will find their verdict against him.

6. By the certificate of acknowledgment, appended to the mortgage, given by Kem and wife to secure the note sued on, it appears that they personally appeared before A. L. Loucks, a notary public, who took their acknowledgment to the same, that they were personally known to him to be the same persons who signed the mortgage as parties thereto, that they acknowledged to him that they executed the same as their voluntary act and deed for the uses and purposes therein mentioned, and that he, the said Loucks, prior to the taking of the acknowledgment of the defendant, Sarah E. Kem, made her acquainted with the contents of said mortgage, and that upon an examination separate and apart from her husband, she acknowledged that she executed the same, freely and without fear, compulsion or undue influence of her husband. The court therefore instructs the jury, that the matters stated in said certificate are "*prima facie*" true, and it devolves upon the defendants to show, by a preponderance of proof, that the facts as stated in this certificate are untrue; and unless the jury believe that the defendants have shown, by a preponderance of evidence, that the facts therein stated are false, they will find a verdict against the defendant, Sarah E. Kem, provided that they also find a verdict against Samuel Kem, her husband, upon the issues presented by his answer in this case.

7. The court instructs the jury, that false representations made by a vendor, in the sale of a chattel, to amount to a fraud upon a purchaser, must be known by the vendor to be false when made, and made with intent to deceive, and actually deceiving the buyer. If, therefore, the jury believe, that in the transaction between Brolaski and Kem, which resulted in the sale of the stock by the former to the latter, Brolaski made no false representations to said Kem concerning the matter, which he knew at the time to be false, and made with intent to deceive said Kem, the said Brolaski made no representations which amounted to a fraud upon said Kem in said purchase. It is not sufficient to justify the jury in finding fraud upon said Brolaski in said transaction, that they be-

lieve the representations made by him to said Kem were, in point of fact, false. They must further believe, from the evidence, that such representations were, at the time they were made, known to be false or not known to be true, by him, the said Brolaski, and made with the intent to deceive the said Kem.

8. The court instructs the jury that the defendant, Samuel Kem, cannot complain of any fraud to which he was, knowingly, a party.

9. The jury are instructed that fraud on the part of Brolaski, in the transaction between him and the defendant, Samuel Kem, which resulted in the purchase of the stock in question, must be established to the satisfaction of the jury, before they can return a verdict in this case in said Kem's favor.

10. If the jury believe, from the evidence, that the trade between Brolaski and Kem for the stock for which the note sued on was given was fairly conducted, made and concluded by and between them, then the verdict in this case must be for plaintiff.

There were twenty instructions asked by plaintiff, which were refused, and three instructions asked by defendants which were given; but it is clear, that the instructions above copied constituted the legal opinions advanced to the jury and covered all the points in the case.

One would hardly imagine that these instructions would be controverted by the plaintiff as they were so strongly in his favor.

The court, in these instructions, evidently did not adopt the opinion of Judge Story in Doggett vs. Emerson, (3 Sto., 733,) in which, that eminent expounder of equity law observed: "It appears to me, that it is high time, that the principles of courts of equity upon the subject of sales and purchases should be better understood and more rigidly enforced in this community. It is equally promotive of sound morals, fair dealing and public justice and policy, that every vendor should distinctly comprehend, not only that good

faith should reign over all his conduct in relation to the sale, but that there should be the most scrupulous and exalted honesty, or as it is often felicitously expressed, *uberrima fides*, in every representation made by him as an inducement to the sale. He should literally, in his representations, tell the truth, the whole truth, and nothing but the truth. If his representation is false, in any one substantial circumstance going to the inducement or essence of the bargain, and the vendee is thereby misled, the sale is voidable, and it is morally immaterial, whether the representations be willfully and designedly false, or ignorantly or negligently untrue. The vendor acts at his peril and is bound by every syllable he utters or proclaims, or knowingly impresses on the vendee, as a true or decisive motive to the bargain, and I cannot but believe, if the doctrine of law had been steadfastly kept in view and fairly upheld by public opinion, the various speculations, which have been so sad a reproach to our country, would have been greatly averted, if not entirely suppressed, by its salutary operation."

But Judge Story's view in regard to the necessity of requiring a vendor to " tell the truth, the whole truth, and nothing but the truth," seems not to have been generally accepted by the courts in this country in cases where the vendee stands upon an equal footing with the vendor, in regard to opportunities of inquiry, and through negligence, fails to inform himself from other quarters as to the truth of the vendor's representations, or relies on his own personal examination. In this case, the vendor was president of the company, whose stock he was selling, and the vendee had a right to presume, was fully informed in regard to the financial condition of the company and could not be reproached with negligence in failing to inquire in other quarters.

In the English Court of Chancery, Judge Story's strict views are fully sustained, and the knowledge or ignorance of the vendor in regard to the truth of his representations, where such representations are relied on by the vendee, regarded as immaterial. In Rawlins vs. Wickham, (Law Jour-

nal, 28 N. S. Equity, 188,) the vice-chancellor said : " It has been urged, that the means of verifying the representations which were unquestionably made to the plaintiff, were open to the plaintiff. But that is no defense against a charge of misrepresentation. It frequently happens, in cases of this nature, that the means of ascertaining the truth are within the power of the complainant, but it has never been held, that in order to entitle him to rescind his contract, he is bound to show that he resorted to all the means of information in his power. The very motive of misrepresentation is to check inquiries of this nature." In an appeal in this case to the lords justices, Lord J. Knight Bruce observed : " On the question, whether fraud has been practiced, it is not necessary to go any further; it may have been that this was not the only misrepresentation, but it is enough to say that this was distinctly proved. Is there any excuse, any apology for this? For Bailey there is none, as a professional man, personally attending the bank, and personally managing its affairs. I say, in the most pointed manner, that it was his duty to know what the books contained. Beyond a doubt, he was a party to the gross misrepresentations. On the other hand, Wickham was an inactive partner; he did not inter fere with the customers, attended, only occasionally, at the bank, not meddling with the books, and knowing nothing of them, but still a partner, and not a sleeping partner, who had a right to examine the books and to make himself acquainted with the whole state of the business, and as between himself and a partner newly introduced, it was his duty to be so acquainted. What did he do? Whether with acquaintance, or lack of acquaintance with the affairs, it is proved that he joined with Bailey in the misrepresentations in producing the statement of accounts alluded to, and alleging it to be an accurate account of the position of the bank. He ought not to have asserted what he did not know to be true. If he did not know, it was his duty to say ' it may be correct or not, I do not know the facts, you must ascertain for yourself.' He did not say so. He joined in the assertion that

the falsehood was truth, and in the position in which he stood towards plaintiffs, I am clearly of opinion, that he was as much personally liable as if he had personally known the falsehood of what he asserted."

And Lord Justice Turner observed: "If in a treaty for a purchase, one falsely makes a representation, surely he cannot be afterwards heard to say that he knew nothing about the matter, and still more surely, he cannot be allowed to retain any benefit which he might have acquired from the representation which he has made. It is necessary to say this much, for it would be most dangerous to allow any doubt of this doctrine. The opposite principle would be opening a door by which to escape from every case of misrepresentation."

In N. B. & Can. Railw. Co. vs. Muggeridge, (1 Drew & Sm., 363,) the vice-chancellor observed, in regard to the necessary diligence on the part of the purchaser; "It is of no avail to say that Mr. Muggeridge was wanting in caution and vigilance and prudence. I agree, indeed, that to a certain extent he was so. A wise and prudent man would, I think, have paused before he embarked his money; and I have no reason to doubt, that if the defendant had gone to the office of the company, and made the inquiry, he would have been informed of all the details he chose to inquire about. I confess it does not appear to me necessary to suppose that there was, in this case, actual, intentional, fraudulent misrepresentation."

In Regnell vs. Sprye, (1 DeGex., Mac. & G., 708,) Lord Justice Cranworth says: "Once make out that there has been anything like deception, and no contract resting in any degree on that foundation can stand. It is impossible so to analyze the operations of the human mind, as to be able to say, how far any particular representation may have led to the formation of any particular resolution, or the adoption of any particular line of conduct. No one can do this with certainty, even as to himself, still less as to another. Where certain statements have been made, all in their nature capable, more

or less, of leading the party to whom they are addressed, to adopt a particular line of conduct, it is impossible to say of any one such representation so made, that even if it had not been made, the same resolution would have been taken, or the same conduct followed. Where, therefore, in a negotiation between two parties, one of them induces the other to contract on the faith of the representations made to him, any one of which has been untrue, the whole contract is in this court considered as having been obtained fraudulently."

In Story's Equity Jurisprudence, (§ 191), the principle is stated thus: " If a representation is made to another person going to deal in a matter of interest upon the faith of that representation, the former shall make that representation good if he knows it to be false. To justify, however, an interposition in such cases, it is not only necessary to establish the fact of misrepresentation, but that it is a matter of substance or important to the interests of the other party, and that it actually does mislead him. For if the misrepresentation is of a trifling or immaterial thing, or if the other party did not trust to it, or was not misled by it, or if it was vague or inconclusive in its own nature, or if it was upon matter of opinion or fact equally open to the inquiries of both parties, and in regard to which neither could be presumed to trust the other, in these and the like cases there is no reason for a court of equity to interfere to grant relief on the ground of fraud."

This position of Judge Story seems to be the one on which the decisions of this court (Laughton vs. Green, 49 Mo., 363; Holland vs. Dudevon, 38 Mo., 56; Bryan vs. Hitchcock, 43 Mo., 527; McFarland vs. Carver, 34 Mo., 195) have been based.

In the present case, the representations were made by one, who, by his position, the law would presume to be better acquainted with the condition and prospects of the company of which he was president, than any one else, and therefore no inquiries outside could have been necessary. The failure to make such inquiries is no proof of want of diligence. The

instructions, therefore, though mainly predicated upon the decision above referred to, were undoubtedly more favorable to the plaintiff than he was entitled to.

It will be observed, that the instructions in this case required the representations of the vendor to be proved false and fraudulent and so known to be by him so that the vendee relied solely on them in his purchase. The verdict was under these instructions for the vendee. These instructions stated the law in the most favorable form for the plaintiff, undoubtedly more favorably than the decisions of Judge Story and the English Chancellors justified. We doubt if it is equity to allow a sharper to insist on a fulfillment of his bargain, on the ground that his victim was so destitute of sagacity as to make no further inquiries. We do not understand the decisions of the court to have gone so far. It will be seen that most of them have been in relation to the sale of lands, in regard to which, both buyer and seller had equal opportunities of informing themselves. When we reach a case where the parties do not occupy an equal footing in this respect we must pause. The doctrine enunciated by Judge Story deserves consideration and commends itself to an instinctive sense of justice, and therefore we think if any error was committed in the instructions in this case, it was on the side of the plaintiff below. But if we could be allowed to weigh the evidence in this case, upon the question of any fraudulent representations by Brolaski, we might find a different verdict.

This court has no province beyond deciding the law. The facts of a case are for juries in the courts that try the case, and the only question we have to determine is, whether the law is properly expounded to juries in the cases appealed from. We are satisfied that the law in this case was stated to the jury in the most favorable form it could have been for plaintiff, in fact more favorably than the adjudications authorize.

The testimony admitted or excluded upon exceptions on the issue—the main one in the case—so clearly, had no influence

on the result that we have deemed it unnecessary to notice it. The important exceptions have been heretofore noticed and passed on.

Judgment affirmed; the other judges concur.