McElroy v. Maxwell.

---

## McElroy v. Maxwell, *Appellant.*

1. **Court of Equity:** SPECIFIC PERFORMANCE: UNFAIR CONTRACT. A court of equity will not specifically enforce a contract for the sale of land, where it contains such elements of surprise, undue advantage or unfairness as to prompt a court of equity to say that it is not right and proper to administer the relief, and the relief will be refused in such case, though the court would not rescind the contract thus made, but would remit the complaining party to his remedy at law.

2. ———: ———: ———. In a suit for specific performance, it appeared that defendant was an illiterate and feeble old woman, who had been urgently importuned by a real-estate agent, a former neighbor and member of her church, for authority to sell her farm, but that she persistently refused to do so until the last interview, when the agent induced her to sign what she supposed to be a memorandum stating that she finally declined to sell, but which was in reality a power of sale, under which the agent made a contract in her name. *Held* that this contract would not be enforced in equity.

3. **Specific Performance:** AGENT OF BOTH PARTIES. Where the vendor's agent was also acting as agent of the vendee, without the knowledge of the vendor, his contract of sale will not be enforced against the vendor.

4. **Practice in Supreme Court:** EQUITY FINDINGS. The supreme court will exercise a supervisory control over the findings of the lower court in equity cases.

*Appeal from Jackson Circuit Court.*—HON. T. A. GILL, Judge.

REVERSED.

*Gates & Wallace* and *A. Comingo* for appellant.

(1) Specific performance is not an absolute right. It is a matter of sound judicial discretion, exercised upon a consideration of all the facts and circumstances of each case in which it may be sought. *Paris v. Haley*, 61 Mo. 461; *Ivory v. Murphy*, 36 Mo. 542; *Durritt v. Hook*, 8 Mo. 382; *Fish v. Lightner*, 44 Mo. 272; *Taylor v. Williams*, 45 Mo. 83, 84; *Fish v. Lesser*, 69 Ill. 395; *Lear v. Chouteau*, 23 Ill. 39; *Forcetly v. Barnhart*, 1 P. F. Smith, 281; *Snell v. Mitchell*, 65 Me. 50; *Rust v. Conrad*, 47 Mich. 454; Pomeroy on Con., sec. 35, n. 1; Waterman on Spec. Per., sec. 6, and notes. (2) This discretion, it is true, is not arbitrary; nor does it depend on the mere pleasure or caprice of the court. Specific performance will be denied, however, even where the contract is fair in all its terms, if its enforcement, from subsequent events, or even from collateral circumstances, would work a hardship. *Taylor v. Williams*, 45 Mo. 83; *Southworth v. Hopkins' Heirs*, 11 Mo. 331; *Veth v. Gierth*, 92 Mo. 97; *Bruck v. Tucker*, 42 Cal. 346; *Fish v. Lesser*, 69 Ill. 394; *Lear v. Chouteau*, 23 Ill. 39; *Stotenburgh v. Tompkins*, 1 Stockton, 332; *Seymour v. Delaney*, 6 Johns. Ch. 222; s. c., 3 Cowen, 445; *Willard v. Taylor*, 8 Wall. 557; Waterman on Spec. Per., secs. 158, 159, and citations. (3) It should be refused in all cases in which it shall appear that there has been the least unfairness, undue influence, overreaching, misrepresentation, or undue solicitation

or persuasion, exercised in procuring the contract. It must be fair, just and certain. *Harrison v. Town*, 17 Mo. 237; *Rust v. Conrad*, 47 Mich. 454; *Smith v. Wood*, 12 Wis. 383, and citations; *Hay v. Lewis*, 39 Wis. 369; *Lear v. Chouteau*, 23 Ill. 42; *Fish v. Lesser*, 69 Ill. 394; *Snell v. Mitchell*, 65 Me. 48; *Plummer v. Keppler*, 26 N. J. Eq. 481; *Modisett v. Johnson*, 2 Blackf. (Ind.) 439; Pomeroy on Contracts (Spec. Per.), sec. 179, p. 251. (4) Specific performance with compensation will be refused if the vendee has either actual or constructive notice, before filing his bill, of a defect in the title, which will prevent the vendee from executing the contract according to its terms. *McQueer v. Chouteau's Heirs*, 20 Mo. 227; *Morss v. Elmdorff*, 11 Paige Ch. 277; *Hatch v. Cobb*, 4 Johns. Ch. 559; *Kempshall v. Stone*, 5 Johns. Ch. 193; *Wood v. Majoribanks*, 7 H. L. Cases, 806; *Philips v. Stanch*, 20 Mich. 369. It will also be refused where the vendee has made no inquiries as to the condition of the title, or where there is no agreement or representation as to quantity or title. Pomeroy Spec. Per., sec. 444. (5) The court will not decree specific performance of a contract which is not clearly established. It requires much less strength of case to resist the bill than to maintain it. If the evidence is conflicting as to the fact of the contract, the decree will be denied. *Veth v. Gierth*, 92 Mo. 97; *Strange v. Cowley*, 91 Mo. 287; 2 Story's Equity, secs. 769, 770; *Railroad v. Lewis*, 76 Va. 833; *Morrison v. Searight*, 4 Baxter, 477. (6) Although Hughes professed to act as the agent of the defendant, the evidence shows quite plainly that he was acting throughout as the friend and agent of the plaintiff. If, however, he was acting as the agent of both parties, the contract he professes to have made with defendant will not be enforced. *Hesse v. Briant*, 6 DeG. M. & G. 623; *Fish v. Lesser*, 69 Ill. 394; Story on Agency [9 Ed.] sec. 31, and note; *Morgan v. Hardy*, 16 Neb. 427. (7) The

contract set out, in the petition is not the contract of defendant Matilda Maxwell, but is the contract of Hughes. *Morgan v. Bergan*, 3 Neb. 209; *Spencer v. Field*, 10 Wend. 87, and citations; *Lessee of Anderson v. Brown*, 9 Ohio, 151. (8) In view of all the facts and circumstances disclosed by the record in the cause, we submit that the court erred in its rulings during the progress of the trial; that by its decree it should have dismissed plaintiff's bill, and that it erred in overruling defendant's motion for a rehearing.

*Daniel B. Holmes* and *Karnes & Krauthoff* for respondent.

(1) There was abundant evidence to sustain the finding of the circuit court, and this court should not interfere with it. *Matthias v. O'Neil*, 94 Mo. 520; *Sharpe v. McPike*, 62 Mo. 300; *Snell v. Harrison*, 83 Mo. 651; *Erskine v. Loewenstein*, 82 Mo. 301; *Judy v. Bank*, 81 Mo. 404. (2) The rule of law is that events subsequent to the contract, and not so involved in it as to render it unequal at the time it was entered into, cannot be brought forward to show the hardship in enforcing it. Fry on Spec. Per., sec. 402; Waterman on Spec. Per., sec. 173; *Marble Co. v. Ripley*, 10 Wall. 339; *Lee v. Kirby*, 104 Mass. 420; *Low v. Treadwell*, 12 Me. 441; *Addington v. McDonnell*, 63 N. C. 389; *Webb v. Railroad*, 9 Hare, 129; 21 Gratt. 75. (3) A broker may receive commissions from both parties when he is acting with full knowledge on the part of both. Mrs. Maxwell must have known in the very nature of things that the other party would compensate the agent, as this appears from the contract outside of the positive declarations of Hughes on that subject. *Alexander v. Society*, 52 Ind. 466; *Rowe v. Stevens*, 53 N. Y. 621; *Scribner v. Collar*, 40 Mich. 375; *Morgan v. Elford*, L. R. 4 Ch. Div. 352; *Lynch v. McKenna*, 58 How. Pr. 421. (4) The cases cited by appellant under points 4 and 5

and other points do not support the propositions there stated. ( 5 ) Parol evidence was competent to show a proper formal description of "Matilda Maxwell's farm situated in section 32," etc. *Hurley v. Brown*, 98 Mass. 545; *Mead v. Parker*, 115 Mass. 413; *Ross v. Baker*, 72 Pa. St. 186; *Barry v. Coombe*, 1 Peters, 640; *Hatcher v. Hatcher*, 1 McMullin's Eq. 311; *Moss v. Atkinson*, 44 Cal. 3; *Simmons v. Spruil*, 3 Jones' Eq. 9; *Phillips v. Hooker*, N. C. Eq. 193; *Atwood v. Cobb*, 16 Pick. 227; *Ives v. Hazard*, 4 R. I. 14; *Spangler v. Danforth*, 65 Ill. 152; *Holmes v. Evans*, 48 Miss. 247. All the law requires in the matter of description is that there be sufficient to enable the parties to ascertain and identify the land by the aid of extraneous evidence. *Springer v. Kleinsorge*, 83 Mo. 152; *Titherow v. Anderson*, 63 Mo. 96; *Briggs v. Munchon*, 50 Mo. 467; *Long v. Wagoner*, 47 Mo. 178.

SHERWOOD, J.—This is a proceeding for specific performance, instituted in the Jackson circuit court for one hundred and twenty acres of land lying in the vicinity of Kansas City.

Having carefully read the evidence, and given it much consideration, the following statement will present a sufficiently accurate history of the transaction to form the basis of the conclusions hereafter drawn therefrom :

Hughes, the whilom elder in the church and Sunday-school superintendent, went to the house of Mrs. Maxwell, a member of the same church, on Saturday, March 1, 1884, *ostensibly to buy hogs ;* but in reality to buy the land in question. Hughes had formerly lived in the neighborhood, but then was, and for several years had been, a resident of Kansas City, where he had gone into the real-estate business. Having lived as a neighbor of Mrs. Maxwell, only a mile distant, for several years, and having officiated as a preacher of the church

and superintendent of the Sunday school, he had been in years past a frequent visitor at her house, and always manifested great interest in her affairs, and had frequently proffered her his advice in their management.

On the date referred to, a very cold and disagreeable wind was blowing from the northeast, and Hughes came there about ten o'clock in the morning on his assumed porcine errand, *though he did not know Robert had any hogs;* and being told by Robert, her son, that he had no hogs to sell he commenced a long-winded conversation with Mrs. Maxwell about his family ; the low prices for which excellent lands in the county could be bought, etc., etc., until nearly time to get dinner, when Mrs. Maxwell left the room for that purpose, leaving Hughes talking with Robert. Dinner being over, defendant returned to the sitting room, when Hughes renewed the conversation with her, called her *"Sister"* Maxwell, and suggested to her to give him her land to sell, and, on her replying that she did not wish to sell it, he said he thought he could sell it for eighty dollars per acre. He kept on insisting that defendant should let him have the land to sell, when she told him, even if she wished to sell, she would not do so for less than one hundred dollars per acre.

Hughes went away late that afternoon. The next Monday morning was a day similar in every respect to the preceding Saturday, and with a very disagreeable wind blowing from the northeast ; but Hughes, nothing daunted, was promptly on hand at about the same hour as on Saturday, and renewed his endeavors to induce Mrs. Maxwell to part with her land. At that time she was weak and nervous, sixty-five years old, illiterate, and in such poor health that she had not been outside of her yard for the three previous months. Hughes told Mrs. Maxwell that *he had not intended to come over that day, but being in the neighborhood,* close by,

he had concluded to come and talk to her about the land ; said McElroy would buy the land at eighty dollars per acre, and on being told by Mrs. Maxwell that, even if she wanted to sell, it would not be at that price, Hughes remarked that it was more than it was worth ; that the taxes were eating it up ; that it was so much trouble to keep up the land, the fences, and hire help, when Mrs. Maxwell told him her father had given her the land so many years ago that she wished to remain there ; that there was no necessity for selling it, and that she would not do so.

But Hughes still kept on talking how advantageous it would be for Mrs. Maxwell to sell her land ; that she could get eighty dollars per acre for it, which would amount to ten thousand dollars, and with one-half that sum she could buy a better farm for forty dollars per acre, and then loan out five thousand dollars at interest. Then he shifted the conversation to Kansas City property ; how long he had been an elder in the church ; how much he had done for it, and how badly he had been treated by it by being turned out. He then went on to quote Scripture, spoke of the early Christians at Antioch, how *they sold their lands* and other property and laid it down at the apostles' feet, etc., etc. Recurring again to the subject of Mrs. Maxwell's land, he advised her to sell the land, buy a good place in town, enjoy " *church privileges,*" and loan her money out at a good rate of interest.

After much conversation of this sort he asked Mrs. Maxwell if she would take one hundred dollars per acre for the land, and on her refusing to do so, and telling him that he was wasting his time talking to her, he then produced a little book, and said to her as she testifies : " ' Well, Mrs. Maxwell,' he says, ' McElroy is waiting to go to Chicago, You see he is waiting on me, and I ought to have gone some time ago. Now if you will just sign this little paper, I will be going.' I said it is not

McElroy v. Maxwell.

necessary for me to sign it. 'Well,' he said, 'I think he will go to-night, or in the morning, if you·will sign it; he has been waiting three or four days, I think he said, to see if I would make this trade, and I have not made it.' He said if I would sign it he would be going. I told him no, that I did not want to sign it. I have never had the benefit of very much education and I cannot read your writing. 'Why,' says he, 'there is nothing in it, only a few words to McElroy to tell him how it is, so he won't be waiting any longer.' I refused to sign it, and said I don't know what you have written. 'Why,' says he, 'Sister Maxwell, do you think I would do anything to give you trouble or to be of any disadvantage to you? I would not do such a thing for the price of your land. It is nothing that will be of any disadvantage, or give you any trouble;' and then I signed in that book. That is just exactly the words we said. There were some more words along there that I do not remember. When I told him I did not know what it was, he read it over. He said that J. M. Hughes had been there that day trying to buy my land, and he had offered me one hundred dollars an acre, that I had refused to take it, and refused to sell it at all; and that was all he could do. I don't know but there might have been more; I do not remember the wording; but that was pretty near all that was said. I did not read it; I told him I could not read his handwriting I could not read it unless it was very plain. I was raised in the country where there were no schools. I thought I was signing some paper that they would not trouble me any more. My health was bad, and McElroy had been there, and I was so worried with him that I thought to myself if I could get rid of them by signing I will sign it. He said McElroy would start to Chicago to-night or in the morning, etc. No one was in the room at the time I signed. Robert came in and Hughes talked some with him. He said I have offered your mother one

hundred dollars an acre for her land, and she has refused to take it, and I think she has been a very foolish woman for it. I don't know what Robert said to him. I had a terrible headache, a nervous headache. I felt terribly bad, and he talked so long and so loud, I don't know what Robert said. He and Robert went out."

The paper which Mrs. Maxwell was thus induced to sign was in this form:

"I hereby authorize J. M. Hughes to sell my farm for the sum of twelve thousand dollars net. I further obligate myself to make good and sufficient title to it for said amount. This third day of March, 1884.

"MATILDA MAXWELL."

It was quite late in the afternoon, about three o'clock when Hughes left Mrs. Maxwell to return to Kansas City, but when he left he gave no intimation to Robert that he had been authorized by Mrs. Maxwell to sell the land at one hundred dollars per acre ; on the contrary, he told him as they went out together where his horse was hitched, that his mother was a very foolish woman not to sell at such a price, *i. e.,* one hundred dollars per acre. Hughes reached Kansas City about dark, put up his horse and went to the Coates House to see McElroy and *"to report"* to him about the land, and found the lamps lit. McElroy, as he himself says, wanted this land *"terribly bad."* He had been out there to see Mrs. Maxwell in order to buy it, some three months prior to the third day of March, 1884.

When Hughes and McElroy met, Hughes *"reported,"* and they soon came to an understanding which resulted in Hughes giving to McElroy the following paper :

"March 3, 1884.

"Received of Hugh L. McElroy fifty dollars in part payment for Matilda Maxwell's farm, situated in section thirty-two, township fifty, range thirty-two,

which I have this day sold to said McElroy, as agent for said Matilda Maxwell, for the sum of twelve thousand dollars net; payment to be made in full, as soon as a deed to said farm is executed to said McElroy.

"J. M. HUGHES."

Thereupon, McElroy gave to Hughes a check for fifty dollars, to bind the bargain. But Hughes the next morning was so generous as to offer Mrs. Maxwell double that amount, one hundred dollars in twenty-dollar gold pieces. This was done as Hughes says, "not for the purpose of binding the trade;" but "as a *double guaranty* that the thing was all right."

There is no doubt that Hughes was acting throughout the entire transaction as the *agent of McElroy.* This is shown in a number of ways; McElroy bought other lands in the vicinity through Hughes, as agent. McElroy's undenied admissions to Mrs. Carpenter show that he tried to induce Hughes to buy the land in controversy, and not let Mrs. Maxwell know he was buying it for him, because, as he said, she was prejudiced against him, on account of some trade he had had with her children in regard to their land.

McElroy's own evasive testimony establishes the existence of this agency, as the following brief excerpt will show:

"*Q.* Is it not a fact that you were constantly up in Mr. Hughes' office, and that you were talking with him and directing him to go and get this land; did you not ask him to go and get the authority in writing from Mrs. Maxwell? *A. No, sir; I do not know that I did.* * * *

"*Q.* What did you say? *A. I told him that I had offered her eighty dollars an acre for the land.* * * *

"*Q.* Did you not go to Mr. Hughes' office and state that to him for the purpose of getting Mr. Hughes to buy this land for you? *A. I do not know whether I did.* * * *

"*Q.* When was the last time you saw Mr. Hughes before this came up? *A. I think it was, perhaps, three or four days.*

"*Q.* You had seen him three or four days before he went out? *A. Yes, sir.*

"*Q. Did you not tell him to go there? A. I do not think I did.* * * *

"*Q.* Is it not a fact that three or four days before Mr. Hughes went, that it was perfectly understood between you and him that he was going out there and buy this land? *A. He spoke about going.*

"*Q.* You can answer that question *yes or no; was it not understood between you and Mr. Hughes that he was going to try to buy this land for you? A. He spoke about going; he spoke of the land.*

"*Q.* You can answer that question *yes or no;* was it not understood between you and Mr. Hughes that he was going to Mrs. Maxwell's to try and buy this land for you? *A. He said that he was going to see Mrs. Maxwell about the land; he heard me say I would give eighty dollars an acre.*

"*Q.* What did you say to him when he said he was going out there? *A. He asked me if I had any objections to his going out; I told him I had not, but I did not send him.*"

Nor is this impression that Hughes was the agent for McElroy at all lessened by the fact that McElroy's own testimony shows that Hughes after dark went to the Coates House, and "*came up to report in regard to this land of Mrs. Maxwell's.*" Nor by the sedulous care exhibited to make Hughes' "half commission," for the sale of the land which McElroy agreed to pay him if "it goes through all right," "*a subsequent arrangement entirely.*" In considering such questions, in weighing the probabilities of any given transaction, courts should not lose sight of the "*experience of common life,*" that self-interest is the mainspring of human action, and

that even *real-estate agents* are no exception to this general rule. On this basis, it is wholly incredible that Hughes was *entirely disinterested* when making the alleged contract with Mrs. Maxwell; he expected his commissions from some one, and that person, his employer, McElroy.

I. From the premises stated, the conclusion is drawn that the contract in question should not be specifically executed, even could we lay aside the testimony rendering it doubtful whether Mrs. Maxwell *knew* what she was signing, when she signed the memorandum authorizing Hughes to sell her land. Granting that she knew and fully comprehended the nature of that instrument; granting that it was correctly read to her, it is not at all clear that plaintiff should have the remedy he seeks.

Treating of the subject of the specific enforcement of contracts for land, Waterman says:

"A contract, to be specifically enforced, must not only not be one-sided, unjust and unfair, but it must not have been obtained by unscrupulous means, or by the concealment of material facts. It may be free from actual fraud or illegality, and not contain elements of hardship or oppression, and yet be so unequal as to be incapable of specific enforcement. Not that the court will nicely weigh the relative advantages or disadvantages of a bargain fairly made; but it will consider whether the agreement is such a one as a court seeking to do equity ought to compel a party to perform. On the other hand, specific performance of a contract entered into under circumstances of unfairness, will, in general, be refused, although such unfairness was unintentional. Thus, where, at an auction sale, the solicitor, who was known to be the agent of the vendor, bid for the purchaser at his instance, and the bids, from the known relationship of the solicitor to the vendor, were supposed to be those of a puffer, and so hurt the sale,

specific performance was refused at the suit of the purchaser, though the act of the solicitor was inadvertent. The unfairness of the contract may appear from its terms, or it may be shown by matters, extrinsic, and proved by parol evidence. * * *

"In looking at a contract with reference to its fairness, regard will, of course, first be had to the subject-matter, terms and the manner in which it was executed, as well as to the price as compared with the real value of the property; and then to the circumstances under which the contract was entered into, particularly the character of the parties and the relation they sustain toward each other, such as the mental condition of the person against whom specific performance is sought, his age, or poverty, or his acting without an attorney, when incompetent to take care of his own interests, etc. When there is evidence to show that there was not a full, entire and intelligent consent to the contract by the party against whom performance is sought, or that it was entered into under circumstances of surprise, or want of advice, or that one of the parties was an illiterate person, or in distress, the court will be reluctant to compel him to perform." * * * Specific Performance of Contracts, secs. 158, 159.

If the contract has been brought about by unfairness or over-reaching on the part of the vendee or his agent, or there has been undue influence on the part of such party or agent, or undue advantage taken of the vendor, or the latter has made the contract in circumstances of surprise, or undue solicitation; if, in short, the evidence shows any such or similar features, anything which prompts a court of equity to say it is not right and proper to entertain the cause and administer relief, then such relief will be refused though that court would not rescind the contract thus made, but would remit the party complaining to his remedy at law. *Rust v. Conrad*, 47 Mich. 449, and cases cited; *Fish v.*

*Lesser,* 69 Ill. 394 ; *Railroad v. Cromwell,* 91 U. S. 643 ; 2 Story's Eq. Jur. [ 13 Ed.] secs. 750, 750*a ;* Pomeroy on Contracts, sec. 179.

Here, we have as vendor an illiterate woman rapidly nearing the biblical limit of threescore years and ten ; afflicted with rheumatism, weak and nervous, who had not left her own dooryard for three months, approached by her former pastor, who visits her at her farmhouse, with the sole purpose of obtaining from her something which will wrest from her her homestead to which she was greatly attached. He was undoubtedly the agent of the plaintiff as before stated. All signs and earmarks of agency fail if he was not such a one. Shrewd, sharp and alert, well versed in the ways of the world, he throws out a skirmish line of indifferent conversation as to his family, inquires about *hogs,* and thus gradually draws nigh to the subject nearest his heart, the purchase of that farm.

All day long on Saturday, the first day of March, 1884, he keeps up the ding-dong in that poor old woman's ears about *land, land, land.* Although his *errand* was to buy *hogs,* he remained from ten o'clock in the morning till about sundown, but before he left appealed to "*Sister*" Maxwell to let him have her land to sell and on her refusal still insisted. Monday morning, though as on Saturday the day was cold and a disagreeable wind blowing from the northeast, he faced it and returned to the charge at about the same hour as on the previous Saturday. Then his story is that he *had not intended* to come out that day, but *happened to be close by* in the neighborhood, and so thought he would call and talk about that land. All day long this poor, weak, nervous, rheumatic and afflicted old woman was again subjected to his continuous requests to place the land in his hands to sell at eighty dollars per acre and this was refused. Then he talks Scripture awhile, how the early Christians *sold their land* and brought

the money and laid it at the apostles' feet; then he spoke of how much he had done for the church and how badly he had been treated by it. Then he renewed his importunate solicitations and finally asks if Mrs. Maxwell will take one hundred dollars per acre for her land, and this being refused also, he watches his opportunity when her son Robert was absent from the room and under a false pretense induced her to sign the paper heretofore copied. There is evidence in this record tending to show that the land was worth much more than one hundred dollars per acre, but a contract, obtained in such circumstances as above related, should meet with neither favor nor enforcement at the hands of a *court of conscience.*

II.   If it be true that Hughes was the agent of McElroy, and this is almost self-evident, then this fur-·nishes an additional reason why the contract in question should not meet with specific execution.   An agent employed to sell cannot himself become the purchaser, and an agent employed to buy cannot himself be the seller.   A like principle forbids a contract to be made by one who is acting as the agent of *both* parties ; such a contract is voidable in equity, and may be avoided by either principal.   Story's Agency [9 Ed.] secs. 31, 211; *Mercantile Ins. Co. v. Ins. Co.,* 14 Am. Law Rev. 330; *Fish v. Lesser,* 69 Ill. 394; *Hesse v. Briant,* 6 DeG. M. & G. 623.   There may be instances, as the authorities show, where one may be agent of the two contracting parties, but this can occur only upon the fullest disclosure by the agent of this fact, and the fullest comprehension of it by those contracting through the medium of such agent.

III.   Numerous quotations have been made from cases formerly decided by this court, in which we have said that, in chancery causes, we would defer somewhat to the finding of fact by the court below ; but as recently explained in *Benne v. Schnecko,* 100 Mo. 250, these

statements were not intended to convey the idea that we have abdicated our supervisory control over the lower courts in cases of this nature. If not fully satisfied with the conclusions of fact reached by such courts, we shall reject them and make findings of our own.

For the reasons aforesaid, we reverse the judgment and dismiss the petition. All concur, but BARCLAY, J., absent.