GOTTSCHALK, *Appellant*, v. KIRCHER *et al.*

DIVISION ONE.

1.  **Practice in Supreme Court:** EQUITY CASE: FINDING OF FACTS. Where, in an equity case, the evidence as to whether or not a written assignment of a judgment was a completed contract is so conflicting that the supreme court is not satisfied the finding of the trial court is incorrect, it will not be disturbed.

2.  **Agency, Evidence of.** The evidence in this case *held* to show that one K. was the agent of the assignee of the judgment, and not of the assignor, in the matter of its sale and assignment.

3.  **Equity:** ASSIGNMENT OF JUDGMENT: FRAUD. In a suit to vacate an assignment of a judgment, on the ground of fraud, it appeared there were $7,457 due on the judgment; that it was sold for $400; that at the time of the assignment the purchaser knew that the judgment debtor was dead, leaving an estate of $6,118, while the plaintiff was ignorant of such death. *Held*, that the evidence was sufficient to justify setting aside the assignment.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

REVERSED AND REMANDED.

*F. & E. L. Gottschalk* for appellant.

This being an action in equity, the court will examine the whole case and look into the evidence. *Benne v. Schnecko*, 100 Mo. 257. (2) "If a party intentionally misrepresents a material fact, or produces a false impression by words or acts, in order to mislead or to obtain an undue advantage, it is a case of manifest fraud." 1 Story on Equity Jurisprudence, sec. 192. "If there be an intentional concealment or suppression of material facts in the making of a contract, in cases in which both parties have not equal access to the means of information, it will be deemed unfair dealing,

and will vitiate and avoid the contract." *Turner v. Harvey*, Jacob's Chanc. 169; 2 Kent's Commentaries, p. 482; Bigelow on Fraud, pp. 527, 528, and notes; *Jones v. Keene*, 2 Mood. & Rob. 348. (3) If an agent make a false representation in any negotiation, with or without the privity or knowledge of his principal, and the principal adopts the bargain and reaps the benefit of it, the principal is held bound by the deceit of his agent and is liable. Deceit by agent is deceit by principal. 2 Pomeroy on Equity Jurisprudence, secs. 908, 909; Kerr on Mistake & Fraud, p. 82 (note 674); *Robinson v. Walton*, 58 Mo. 380; *Ins. Co. v. Kuhlman*, 6 Mo. App. 522; Ewell's Evans on Agency, p. 18, note 4, pp. 614, 618; *Stewart v. Cattle Co.*, 128 U. S. 383. And plaintiff assigns, as error, that under the pleadings and evidence the decree should have been for plaintiff, and that judgment for defendant is erroneous. (4) If Mr. Koster really was an agent to sell, and then accepted employment to buy, he became the agent of both parties, and a contract thus made may be avoided by either principal. *McElroy v. Maxwell*, 101 Mo. 294; Story on Agency. [8 Ed.] sec. 211, note 1.

*Lubke & Muench* for respondent.

(1) Koster was the agent of plaintiff; hence, whatever he knew or did is presumed to have been known to and done by appellant. He answered the definition: "One who undertakes to transact some business, or manage some affair, for another, by the authority and on account of the latter, and to render an account of it." Bouvier's Law Dictionary, "Agency." (2) Whether Koster be treated as the agent of plaintiff or not, the finding is still right, because the rule of *caveat vendor* applies. There is no fiduciary

relation between the parties. Plaintiff had no cause to rely upon defendant for information. The parties were completely at arm's length. Theirs were "opposing minds and combating intellects." All means of information were accessible to and within easy reach of appellant. He took abundant time to consider what he would do, and was not hurried. He is not complaining of inferior intelligence, and simply got the worst of a bargain which he was not obliged to enter into. Under such circumstances, courts of equity, in this day, will not aid the foolish and careless trader, but will leave him where he is found. *Wannell v. Kem*, 57 Mo. 489; *Kahn v. Reid*, 18 Mo. App. 127; 1 Story on Equity Jurisprudence, secs. 204, 205; *Jillett v. Bank*, 56 Mo. 304; *Vane v. Cobbold*, 1 Exch. 789; *Slaughter v. Gerson*, 13 Wall. 379; *Rockafellow v. Baker*, 41 Pa. St. 319; *Hobbs v. Parker*, 31 Me. 143; *Brown v. Leach*, 107 Mass. 365; *Long v. Warren*, 68 N. Y. 426; *Monell v. Colden*, 13 Johns. 402; *Holland v. Anderson*, 38 Mo. 58; *Bailey v. Smock*, 61 Mo. 215; *Armstrong v. Winfrey*, 61 Mo. 359; *Langdon v. Green*, 49 Mo. 363; *Bryan v. Hitchcock*, 43 Mo. 527; *Stones v. Richmond*, 21 Mo. App. 17; *Ordway v. Ins. Co,*, 35 Mo. App. 426.

BRACE, J.—This is an action in the nature of a bill in equity against the defendant individually, and as administrator of Frederick Brinkhoff, deceased, to set aside the following assignment in writing:

"John Nyhoff, Administrator of Francis Knapp, deceased,
v.
"Frederick Brinkhoff, Alexander H. Schulte *et al.*

No. 52415. In the St. Louis Circuit Court.

"For value received (to-wit: $400 less expenses) I hereby assign and transfer the judgment recovered in above-styled cause to Charles E. Kircher, which judg-

ment was rendered for $4,932.62 on May 2, 1881, and purchased by me, at administrator's sale, under order of the St. Louis probate court on October 11, 1881, and which sale was approved October 20, 1881.

"[Signed]                    LOUIS GOTTSCHALK.
"ST. LOUIS, May 19, 1887."

On the ground that the same was procured by fraud.

It appears from the evidence that the plaintiff purchased the judgment described in the assignment on account of some of the Knapp heirs, and that he paid $500 for it; that he afterwards collected about $100 on process against the judgment debtors, other than Brinkhoff; that Brinkhoff was a Catholic priest having no visible property from which anything could be made; that one Richard Koster, of the same faith as Father Brinkhoff, had acted as attorney for Nyhoff in the administration of the Knapp estate, and the sale of said judgment to plaintiff; that in 1881, after the sale, plaintiff said to Koster that he would be glad to get $500 for the judgment, and if he, Koster, could find a man to take it off his hands he would allow him a commission; that Koster made some effort to do so by seeing Father Brinkhoff and some of the members of his parish; that these efforts continued for a year or two, but nothing being accomplished the matter was dropped, Koster reporting to the plaintiff that nothing could be made out of the judgment, as Father Brinkhoff was a poor priest, having nothing but a fiddle and a few books, and thus the matter stood for some years, the plaintiff in the meantime going to California, and Father Brinkhoff to Europe; the latter returned to St. Louis, and in February, 1887, died there, while the plaintiff was still in California; his effects came into the possession of his sister; they consisted of one life policy in the New York Life Insurance Company for

$5,000, for the benefit of his estate; stocks, $250; cash items, $167.95, and other personal property appraised at $537, the whole when afterwards reduced to their cash value amounting to the sum of $6,118.30; besides two life policies in benevolent societies, one for $2,000, the other for $1,000, for the benefit of his heirs.     Father Brinkhoff died leaving the judgment and other debts unpaid. Shortly after his death his sister called upon the defendant, disclosed the state of his affairs, and solicited his advice; he thereupon became her adviser, assisted her in the collection of the benevolent policies, and finally became administrator of the estate, and as such all the assets of Father Brinkhoff passed into his hands.

About six weeks after the death of Brinkhoff, and shortly after defendant's interviews with the sister, and before he became administrator, having previous to the death of Father Brinkhoff been advised of the existence of the judgment, he, with some other members of the parish, who with him were also advised of the existence of this judgment, and of Koster's connection with it, called upon Mr. Koster, who knew that Father Brinkhoff was dead, and asked him whether that judgment could be purchased.     Mr. Koster said that "he could not tell, but that Mr. Gottschalk had authorized him formerly to sell it, and he would see him again about it."     Says Mr. Kircher:   " I told him to see Mr. Gottschalk and give us the price that the judgment could be purchased at, and let me know at the office of the German–American Bank.     That there was some estate left, the extent of which I did not know myself exactly, as I had not thoroughly investigated the affair.     There was some insurance beneficiary certificates.     *     *     *     I told him there was some furniture and books, household furniture and some insurance.     *     *     *     I do not remember that I told him what insurance.     I told him that it was

desirable to get possession of the judgment as long as there was some private debts of the priest's, for the purpose of canceling those afterwards by the proceeds of that judgment, and if there was anything left they would be paid. * * * I told Mr. Koster that the less he knew, the better it was for him in the matter, and he asked me no more questions. * * * I stated to Mr. Koster at that time that we would pay him for his services."

Mr. Gottschalk was then in California, where he had been since July, 1886. About six weeks later he returned to St. Louis ignorant of the fact that Father Brinkhoff had died, and that he had left any estate subject to the payment of his debts. Of his return, defendant informed Mr. Koster, who directly went to Judge Gottschalk's headquarters at the office of his brother. Of what took place between them then and after, Gottschalk and Koster give somewhat variant evidence.

Gottschalk testifies: "Mr. Koster asked me whether I still held that judgment; I told him yes. He then told me there were several members or trustees of the church of which Mr. Brinkhoff was pastor, who thought it looked bad to have a judgment hanging over their pastor's name, and that they were willing to raise a small amount to have that judgment released. I said, 'Well, how much are they willing to give?' he said about $250. I told him I would not listen to any such proposition; that I had paid $500 for it, and realized about $100 out of the property of the other defendants; that I could not tell the precise amount. He said, 'Well, I don't think these trustees would give that much;' I said, 'Well, I will look into the matter and see how much those parties are out of pocket,' and might see the parties, and see what they would do, but I was not willing to release Mr. Brinkhoff for that small amount, the judgment being heavy; with that we

separated.    On the next day he came back; he says,
'How is that?' I says, 'Well, I have looked into the
matter and I am out as I thought yesterday (the
parties whom I represent are out) about $400.' He
said, 'Well, that is too much.    You know how it is
with a Catholic priest; he has got nothing but a few
books and a fiddle, and you will never make anything
out of him.'    'Well,' says I, 'that don't make any dif-
ference; $250 is not enough; I will not do it for less than
I am actually out of pocket.'    'Well,' says he, 'if I do
my best to bring them up to that much, you ought to
pay me something.'    I says, 'I will pay you a small
amount.'    He says, 'You ought to pay me about $25
if I get them up to your figure.'    'Well,' says I, 'I have
no objection to paying you that amount.'    He said he
would see the parties about it and come back in the
afternoon.    In the afternoon he came back with the
$400; when I was counting it, I said: 'Mr. Koster, you
know I cannot release Mr. Brinkhoff without releasing
all the defendants on the records of the court, and for
that reason I must put it in a different shape; I must
make an assignment to you of the judgment, and what-
ever else is made out of the other defendants, if there
ever should be anything made out of them, that as a
matter of course comes to me; you only want Brink-
hoff released.'    He says, 'I want something in writing
to show my parties.'    'Well,' says I, 'I will give you a
writing that I will assign that judgment to you, and
that will hold so that you can show it to those people;'
says I, 'To whom shall I assign that judgment.'    He
said, 'In the morning after the thing is completed I will
give you the names, but I cannot do it now, for I don't
know whether they will have it assigned to the three
trustees or to one.'    He then said I should insert Mr.
Charles E. Kircher's name, so I sat down and wrote

that assignment." * * * The same being the one hereinbefore set out in the statement.

He then continues: "It was then agreed that I should assign that matter on the record, but I told him I could not do it right then, because the sale of the probate court to me had never been entered of record in the St. Louis circuit court, and the judgment so far as the circuit court was concerned was still standing in the name of Nyhoff. I told him I would arrange that to-morrow or the day after, and I would get a copy from the probate court of the sale to me and file that with the papers, and assign it on the margin of the record to Mr. Kircher. In pursuance of that agreement I ordered a certified copy of the sale of that judgment to me by the probate court, and on the same day, after Mr. Koster had left, drew up the following agreement, the date and the space where Mr. Kircher's name is inserted being left blank:

"'John Nyhoff, Administrator of Francis Knapp, deceased,
    v.
"'Frederick Brinkhoff, Alexander H. Schulte and Ignatz F. Schulte.

No. 52415. In the St. Louis Circuit Court.

"'Whereas it has been agreed by the undersigned that, in consideration of $400 paid, less expenses, to Louis Gottschalk, the present holder of the judgment recovered in the above case (Number 52415), said Frederick Brinkhoff should be released from all liability on such judgment, and the same should be assigned to Charles E. Kircher, to hold the same with power to release the said Frederick Brinkhoff at any time from the force and effect of such judgment, and from any liability on account thereof, or of the cause of action out of which it arose; and whereas such

money has been paid and such assignment made this day. Now these presents witness: That, if hereafter any money on said judgment be collected from said Alexander H. Schulte or Ignatz F. Schulte, the same is to belong to said Gottschalk, and he may, at his own expense, take all proper steps to enforce such judgment against either said Alexander or Ignatz F. Schulte.

"'ST. LOUIS, May 19, 1887.

"The next day, or the same afternoon, I called at Mr. Koster's office with this agreement, found him in, and said, 'I have ordered a copy from the probate court, and I want to see the matter through, because I don't know when I have to go back again. I wish you would make Mr. Kircher sign that for me, so as to make matters all straight;' he looked at it, and said, 'I don't think Mr. Kircher will sign it;' says I, 'Why not?' he says, 'Well, I think he understands that he bought the entire judgment;' says I, 'Mr. Koster, you only talked about Mr. Brinkhoff, that you wanted Mr. Brinkhoff released;' says I, 'How is that?' 'Oh, well,' says he, 'Mr. Brinkhoff is dead;' says I, 'What! he is dead? How long is he dead?' He said, 'He died in the spring.' 'Well,' says I, 'That is strange, I didn't know anything about that;' then he said, 'Well, I will see Mr. Kircher about the matter as to whether he will sign that or not;' says I, 'Did Mr. Brinkhoff leave any property?' he says, 'No, he did not leave any property; he had nothing but a few books and his fiddle, that is all; you could never be able to make anything out of him anyhow;' I left and left the paper with him."

Koster testifies: "I went down to the office and I said to Judge Gottschalk, that three trustees and members of the church had been in my office about three or four weeks ago, and requested me to buy that judgment, I said I did not know exactly for what purpose they wanted it, but supposed they wanted to get

rid of it because it did not look well to have a judgment against a priest; then he said I should call in the next day at ten o'clock. * * * In the meantime, he said he would look into the matter, and let me know what he would take for it. I called the next day. I asked him: 'Have you considered how much you will take?' 'Yes,' he said, 'I will take $400; I said, 'I think that is rather too much, because some time ago you did not want to make anything out of it, but I will see you later and give you an answer this afternoon. I will then let you know in whose name the assignment shall be made, because I do not know whether it will be made in my name, or one party or several parties;' at the same time I said, 'I suppose if I do sell it for $400 that you will pay me for my services, as we agreed upon years ago; that is five per cent.; he said, 'Yes, all right,' then we parted; at three o'clock in the afternoon I went up to see the Judge again;' I said, 'Well, the parties have agreed to pay the $400, and you may make the assignment in the name of Mr. Charles E. Kircher;' then the Judge drew the assignment, and I paid him the $400, and said to him, 'Judge, we agreed upon five per cent., but I have had some trouble in the matter and it is rather a hot day and you ought to pay me $25;' he said, 'All right,' and took the $25 out of the $400, and paid it to me; he said he could not release the judgment right away; that it would take a few days to get everything in proper shape; * * * that he could not make the proper transfer on the records, until after a few days; that he had to examine some papers in the probate court; he did not know whether the administrator had made the assignment to him at the time it was sold or not, and asked me what I knew about it, * * * I took the assignment on the same day to Mr. Kircher

at the bank,  *  *  *.  who offered to pay me for my services, and I said I was paid by Mr. Gottschalk.''

Early the next morning Judge Gottschalk came to his office and presented to him the paper agreement hereinbefore set out, in which he wrote the name of Mr. Kircher in the blank, and the words, ''St. Louis, May 19, 1887,'' at the bottom. He says: ''Judge Gottschalk requested me to take this paper to Mr. Kircher and have it signed; I read the paper and said, 'I don't think Mr. Kircher will sign that, because he does not understand it that way; I bought the judgment; I bought the whole judgment the way you purchased it from the Knapp estate; we did not say that we would buy only a part, the interest of Brinkhoff only in the matter;' he then said, 'Well, what do you know about the financial condition of the Schultes?' I said, 'I did not know anything about that.' 'He said, 'When did you see Brinkhoff last?' and I said, 'I saw him last about two years ago. Father Brinkhoff is dead. He died about two months ago.' When I said that, Judge Gottschalk looked surprised and astonished, and said, 'Did he have an estate?' 'I said as far as I am informed he left some personal property and a life insurance, but as I told you years ago when you asked me about Father Brinkhoff's ability to raise this judgment, I told you he was a poor man and had nothing but a few books and a fiddle.'  *  *  *  He also asked if an administrator had been appointed, I told him I didn't know  *  *  *  I said, 'I will go and see Mr. Kircher and submit this agreement to him; he may sign it for all I know.' I submitted the paper to Mr. Kircher who refused to sign it, and I left the paper with him.''

The next day Mr. Kircher came to the office of plaintiff with the paper and said: ''I don't think I will sign that agreement, because I understood I

bought the entire business;" in the course of the conversation plaintiff said: "It is very funny that Mr. Koster did not tell me that Brinkhoff was dead. Now I will ask you, Mr. Kircher, has he left any property? Kircher said, "Yes, he has left some estate, a little furniture and life insurance in two benevolent societies." Plaintiff said, "What does this amount to?" Kircher said $2,000 or $3,000, and then asked him to assign' the judgment on the record; plaintiff replied, "This is an entirely different state of affairs from that represented to me; I will give you back your money and you can give me that paper." Kircher refused to take the money, and plaintiff said, "I will not make the assignment on record. I consider the matter is now rescinded and you can get your money at any time." Plaintiff in a day or two was informed by one of the parties that the benevolent policies were for the benefit of Brinkhoff's heirs. Being compelled to return to California, he tendered defendant $405, accompanied with the following written demand:

"ST. LOUIS, Mo., May 28, 1887.

"*Charles E. Kircher, Esq.*

"DEAR SIR:—I herewith tender and offer to pay to you the sum of $405, being amount paid to me, with interest by you, through Mr. Richard Koster, on May 19, 1887, for an assignment of judgment rendered in the St. Louis circuit court (Missouri), in case of John Nyhoff, administrator of Frederick Brinkhoff *et al.*, being case number 52415, and herewith demand the return of the paper containing said assignment, or a rescission or re-assignment thereof, as such assignment so made by me to you is invalid for reasons heretofore stated to you.         I remain yours,

"LOUIS GOTTSCHALK."

The money was refused, and the demand returned indorsed, "Respectfully declined, Charles E. Kircher."

The plaintiff returned to California, where he afterwards learned, for the first time, of the existence of the life policy for $5,000, for the benefit of Brinkhoff's estate, in the New York Life Insurance Company. In June the defendant took out letters of administration on the estate of Brinkhoff, and on the twenty-eighth of October, 1887, presented a certified transcript of said judgment of the probate court, and had the same allowed and classified in the fourth class of debts against said estate, in his favor, for the sum of $7,547.77, having, in the meantime, on the first of July, procured an assignment thereof from John Nyhoff, administrator of Francis Knapp. On the thirtieth of April, 1888, plaintiff instituted the present action, praying the said assignment so made by him be set aside and annulled; that he be allowed to pay the consideration so received by him, and interest thereon, into court for defendant's use, and thereupon the defendant be required to assign said demand so allowed and classified by the probate court on said judgment to him, and for general relief. The answer put in issue the material allegations of the petition. On the hearing, the court found the issues for the defendant and dismissed the bill. The plaintiff appeals.

I.   The evidence is conflicting as to whether the written assignment, which the plaintiff seeks to set aside, was a completed contract. We cannot say that we are satisfied the conclusion reached by the chancellor, that it was, is incorrect; consequently that question may be considered settled in favor of the defendant. *Benne v. Schnecko*, 100 Mo. 250; *McElroy v. Maxwell*, 101 Mo. 294.

II.   It is evident on the face of the whole transaction that Koster was acting as the agent of the defendant; he was buying the judgment against Brinkhoff for the defendant, not selling it to him for the

plaintiff.  The fact that years before he was employed by the plaintiff—if employment it can be called—to find a purchaser for this judgment, gave him no authority to sell, and he never assumed to have any such authority, or to bind the plaintiff in any manner in respect thereof.  The relation, however it may be defined, that once existed between them, ceased to exist years before, had passed out of mind, so that Koster felt at perfect liberty to accept employment from defendant to purchase this judgment for him, as he did, and his former relation to plaintiff seems never to have occurred to him again afterwards, only to be made use of for the purpose of getting his commission out of the money which he had just paid the plaintiff for his real principal.  Such payment, under the circumstances, was no evidence of the existence of the relation of principal and agent between them at that time.  That in this transaction he acted for, and as the agent of, defendant, is the only conclusion that can be drawn from the evidence, and in equity and good conscience the most favorable view that can be taken of the defendant's case and conduct is to so regard him, and to treat his actions and representations as those of the defendant.  *McElroy v. Maxwell, supra;* 2 Pomeroy on Equity Jurisprudence [2 Ed.] secs. 908, 909.

III.  From this standpoint the able counsel for the defendant undertakes to sustain the judgment of the trial court upon the ground that there being no fiduciary relation between the parties making the contract they stood at arms' length, on equal ground, as to mental capacity, and if plaintiff made a bad bargain equity will not interfere to relieve him.  This would be true, in a case where no false representations were made, and no unfair advantages taken, by means of which the trade was effected, and without the use of which it could have been consummated.

But it is not true, where false representations are made to induce the trade, or where the parties do not stand on an equal footing, as where one has knowledge of the existence of facts, materially affecting the value of the property which the other has not, and to whom the means of obtaining such knowledge are not equally open, equity will interpose to relieve an innocent party against the wiles of an unscrupulous trader, who obtains an advantage over him by fraud, whether by positive falsehood, the suppression of a fact which he ought in conscience to make known, by suggestions calculated to lull or mislead inquiries, or by speaking half truths intended to, and which do, suggest a false idea by which the action of such party is procured. In doing so it does not exceed, but follows, the law. *McAdams v. Cates*, 24 Mo. 223; *Barron v. Alexander*, 27 Mo. 530; *Cecil, Adm'r, v. Spurger*, 32 Mo. 462; *Wannell v. Kem*, 57 Mo. 478; *Pomeroy v. Benton*, 57 Mo. 531; *Grigsby v. Stapleton*, 94 Mo. 423; *Cottrill v. Krum*, 100 Mo. 397; Story on Equity Jurisprudence [13 Ed.] sec. 192; 8 American & English Encyclopedia of Law, pp. 644, 645, and cases cited; Bigelow on Fraud, p. 532, *et seq.*

Chancellor KENT says: "If there be an intentional concealment or suppression of material facts in the making of a contract in cases in which both parties have not equal access to the means of information, it will be deemed unfair dealing and will vitiate and avoid the contract. * * * As a general rule, each party is bound to communicate to the other his knowledge of the material facts, provided he knows the other to be ignorant of them, and they be not open and naked, or equally within the reach of his observation." 2 Kent's Commentaries, 482.

In a recent case the supreme court of the United States, speaking through Justice GRAY, says: "If

with intent to deceive, either party to a contract of sale conceals or surpresses a material fact which he is in good faith bound to disclose, this is equivalent to a false representation, because the concealment or suppression is in effect a representation that what is disclosed is the whole truth." *Stewart v. Ranch Co.*, 128 U. S. 383.

The views of this court on the subject have hitherto been forcibly expressed by LEONARD, J., in *McAdams v. Cates, supra*, in the case of a vendor, but the principle is equally applicable to a vendee. "Although many duties must be left by the law to the honor and conscience of individuals, the public morals require us to lay down and enforce such rules in relation to the business affairs of men as will secure fair and honorable dealing, as far as this is practicable consistently with the freedom of individual action and the interests of commerce. If, in a contract of sale, the vendor knowingly allow the vendee to be deceived as to the thing sold in a material matter, his silence is grossly fraudulent in a moral point of view, and may be safely treated accordingly in the law tribunal of the country. Although he is not required to give the purchaser all the information he possesses himself, he cannot be permitted to be silent when his silence operates virtually as a fraud. If he fails to disclose an intrinsic circumstance that is vital to the contract, knowing that the other party is acting upon the presumption that no such fact exists, it would seem to be quite as much a fraud as if he had expressly denied it, or asserted the reverse, or used any artifice to conceal it, or to call off the buyer's attention from it. Common honesty in such a case requires a man to speak out; and accordingly in *Hill v. Gray* (1 Starkie's Rep. 434), when the agent of the vendor of a picture, knowing that the vendee labored under a delusion with respect

to it which materially influenced his judgment, permitted him to make the purchase without removing that delusion, Lord KENYON, before whom the case was tried, held it to be such a fraud as vitiated the sale."

In the case in hand, it is not necessary to go to the full extent of these *dicta*, for we have here not only a *suppressio veri* as to two material facts by the defendant which gave to the property almost all its intrinsic value, *i. e.*, the death of Brinkhoff, and the maturing by his death of a policy for $5,000, applicable to the payment of plaintiff's judgment, but a *suggestio falsi* as to such facts (whether the evidence of Gottschalk or that of Koster is taken as the true version); *i. e.*, the falsehood, that Brinkhoff was still alive and the same poor priest with no income and no possessions, except a few books and a fiddle, that the plaintiff had formerly known him to be, and that defendant knew the plaintiff believed him to be, when he made the assignment, and who but for such belief would not have made it. The defendant is at least frank enough to admit that he does not believe that Judge Gottschalk would have made the assignment if he had known the truth of the matter as he, defendant, knew it at the time. He not only took good care not to disclose it, but that plaintiff should not find it out, by starting and keeping him on a false scent until after the assignment was procured. It would be doing violence to| the name and principles upon which courts of equity have been builded into our system of jurisprudence to refuse the plaintiff the relief he asks for in such a case.

The judgment of the trial court is reversed, and the cause remanded, with directions to enter up a decree in conformity with this opinion. All concur except BARCLAY, J., not sitting.